MURIEL D. HASSETT, ADMINISTRATRIX (ESTATE OF JOHN J. HASSETT) *v.* HOWARD S. PALMER ET ALS.

MALCOLM PEARCE *v.* HOWARD S. PALMER ET ALS.

MALTBIE, C. J., HINMAN, AVERY, BROWN and JENNINGS, Js.

Argued February 9, reargued May 1—decided March 6, 1940.

*E. R. Brumley,* with whom was *Edwin H. Hall,* and, on the brief, *James W. Grady,* for the appellants (defendants).

*Robert L. Halloran,* with whom were *William J. Mulligan* and *A. A. Lawler,* for the appellees (plaintiffs).

MALTBIE, C. J.   These actions were brought, one by the administratrix of the deceased Hassett and the other by the plaintiff Pearce, to recover damages for the death of the former and for injuries suffered by the latter by reason of an electric shock received when a steel measuring tape which they were using on a bridge over the tracks of the New York, New Haven and

Hartford Railroad Company came in contact with the feed wire which furnished power for the operation of the railroad. The trial court concluded that the defendants, operating the railroad as trustees in bankruptcy, were negligent and maintained a nuisance in that they provided no shield or guard over the feed wire, no signs or warnings of danger from the wire, and no other precautions for the protection of persons who had occasion to come or be in such relation to it that they were likely to receive injury therefrom; that the defendants' negligence and maintenance of a nuisance were substantial factors in causing the death of Hassett and the injuries to Pearce; and that neither of them was guilty of contributory negligence or had assumed the risk of injury. It therefore gave judgment for the plaintiffs and the defendants have appealed.

The finding, with such corrections and additions material to the determining considerations as should be made, states the following situation: The feed wire running above the track carried 11,000 volts of electricity. It was supported by two other wires running somewhat above it which were not energized. The layout of the state highway known as the Merritt Parkway crosses the defendants' tracks and the state highway department contracted for the construction of a concrete bridge to carry the highway over them. Work on the bridge began in the late spring of 1937. A meeting was held at the location at which representatives of the state highway department, the contractor and the defendants were present and plans were agreed upon for the protection of workmen on the job, to be effective while the work was in progress. In accordance with these plans the defendants suspended, upon poles above the highway, a wire which connected with the feed wire a short distance on each side of the

bridge and the electric current was diverted to pass through this wire, so that the feed wire was not energized under the bridge, except when a train approached, and while the bridge was under construction three men who were in the immediate employ of the defendants but who were paid by the state, were present to control the electric current and give proper warning to the men on the job when a train approached. Further protection was afforded by a wooden platform above the feed wire extending beneath the arch of the bridge for its full length and a little beyond, which, under the contract, the contractor was obliged to build and maintain during the placing of steel reinforcements and concrete above the track.

The construction of the bridge was finished and the work accepted by the highway department in the fall of 1937. The contractor then removed the wooden platform over the feed wire and while the temporary wire over the highway remained in place, it was no longer used, and, with the consent of officials of the highway department in charge of the work, the employees of the defendants left the job. Thereafter there were no guards of any kind, no fences to keep people away and no warnings of danger from the feed wire. The wires over the track were about four feet below the underside of the arch of the bridge and about eight feet below the parapets upon it. These parapets ran the length of the bridge on each side and were five and one-half inches above the surface of the highway, which was rough-graded. The plans of the highway department contemplated the erection of fences along the tops of the parapets and the pavement was still to be laid upon the surface of the highway. There were signs closing the highway to traffic and it was not legally open, but it was used to a considerable extent by automobiles passing over the bridge. During the

period from the acceptance of the bridge to the day of the accident, some work had been done in the vicinity in grading the sides of the highway, but the finding that men were working there on the day of the accident cannot stand, nor was it found that the defendants knew or could reasonably have known that traffic was passing over the bridge or that men were likely to be working on the highway near it.

On March 28, 1938, Pearce and Hassett, who were engineers of the state highway department, went to the bridge in order to take measurements for the purpose of checking the plans for the contemplated fence along the top of the parapets. They unreeled about forty feet of steel tape and made the measurements. After completing them the tape was laid on the ground parallel to the north parapet of the bridge about a foot away from it and the same distance away from them. In some way one end of the tape fell over the parapet and the tape came in contact with the feed wire and also with Pearce and Hassett. Hassett was killed and Pearce seriously injured.

The plaintiffs claim that they were entitled to recover because the defendants had failed to comply with certain regulations of the public utilities commission concerning the construction and maintenance of electrical supply and communication lines. The defendants contend that these regulations do not apply to feed wires used to supply electricity as a motive power for railroad trains. Granted that they are wrong in this, any failure to comply with these regulations with respect to the feed wire in question would not necessarily establish liability in this case. "The rule which is applicable to actions for negligence based upon the violation of a statutory duty is to all intents and purposes the same as the rule applicable to actions for negligence based upon a violation of a common-law

duty. Where there is no duty, there can be no negligence. The statutory duty must be owing to the person injured, and not to some one else, in order that a violation thereof shall constitute actionable negligence." *Anthony* v. *Connecticut Co.,* 88 Conn. 700, 707, 92 Atl. 672; see also *Longstean* v. *McCaffrey's Sons,* 95 Conn. 486, 494, 111 Atl. 836; *Black* v. *Hunt,* 96 Conn. 663, 666, 115 Atl. 429; *Gonchar* v. *Kelson,* 114 Conn. 262, 264, 158 Atl. 545. The regulations in question establish certain standards with reference to safeguards to be adopted in order to prevent injury to those entitled to rely upon them for protection, but they cannot reasonably be construed as intended to determine the circumstances under which a duty to exercise care arises. The question whether a particular person is entitled to claim the protection of those rules remains for the determination of the court. The basic question for us to determine is, were the defendants guilty of a breach of duty in failing to provide safeguards to prevent such injuries as those suffered by the plaintiffs? In determining it there is no need to consider the claim of the defendants that the railroad, with electricity as its motive power, having been in existence before the highway was laid out, any duty to guard against danger to persons upon the bridge would rest upon those who constructed it and not upon the defendants. They would in any event be under a duty to take steps to guard against the injuries to the plaintiffs only if they should reasonably have anticipated that they were likely to occur. *Botticelli* v. *Winters,* 125 Conn. 537, 542, 7 Atl. (2d) 443; *Bogoratt* v. *Pratt & Whitney Aircraft Co.,* 114 Conn. 126, 141, 157 Atl. 860.

The outstanding facts bearing upon that issue are these: The highway was not legally open to traffic; such traffic as used it consisted of automobiles driving

across it in its unfinished condition; and there is no finding that the defendants knew or should have known of that limited use. It cannot be assumed that at or near the time of the accident men had been working upon the bridge or the highway in its vicinity or that those who had been employed upon the highway after the completion of the bridge had been doing anything which would be likely to subject them to danger from the feed wire. The position of that wire, about eight feet below the parapet of the bridge and higher above the ground than the top of the cars of trains passing over the track, with supporting wires above it, was such that only by some very unusual combination of circumstances could it have come about that the current in the feed wire would be intercepted by some conducting material falling across it, and so brought into contact with the plaintiffs. The trial court could not, upon these facts, reasonably reach the conclusion that the defendants should have anticipated the risk of the injuries which occurred and without such a conclusion there would be no liability upon the defendants.

The situation in this case affords a weaker basis for a claim of liability than that before the court in *Adams* v. *Bullock*, 227 N. Y. 208, 125 N. E. 93, where a boy passing over a bridge above a trolley track which was ordinarily used by pedestrians was injured when a wire which he was swinging in his hand came in contact with the wire which supplied power to trolley cars running underneath the bridge, that wire being about four and one-half feet below the parapet of the bridge; and in that case the court held the defendant not liable, saying (page 210): "The trolley wire was so placed that no one standing on the bridge or even bending over the parapet could reach it. Only some extraordinary casualty, not fairly within the area of ordinary prevision, could make it a thing of danger. . . . No

special danger at this bridge warned the defendant that there was need of special measures of precaution. No like accident had occurred before. No custom had been disregarded. We think that ordinary caution did not involve forethought of this extraordinary peril." See also *Lyman* v. *Putnam Coal & Ice Co., Inc.,* 182 App. Div. (N. Y.) 705, 708; *Maggard* v. *Appalachian Electric Power Co.,* 111 W. Va. 470, 477, 163 S. E. 27; *Bunten* v. *Eastern Minnesota Power Co.,* 178 Minn. 604, 608, 228 N. W. 332; *Kempf* v. *Spokane & Inland Empire R. Co.,* 82 Wash. 263, 265, 144 Pac. 77; *Sheffield* v. *Morton,* 161 Ala. 153, 167. The case before us is clearly distinguishable from *Nelson* v. *Branford L. & P. Co.,* 75 Conn. 548, 54 Atl. 303, where a boy who had climbed upon a highway bridge to dive from it was killed when he seized an electrified wire of the defendant company running between poles attached to the bridge, for in that case it appeared that the custom of boys to dive from the bridge had received at least the tacit consent of town authorities, and as far as the defendant was concerned the plaintiff's intestate was to be regarded as rightfully upon the part of the bridge where he was and the custom of boys to use the bridge for diving was known to the defendant; and it is evident that it could reasonably be found that the defendant should reasonably have anticipated the risk of injury to boys using the bridge for that purpose. The cases of *McAdam* v. *Central Railway & Electric Co.,* 67 Conn. 445, 35 Atl. 341, and *Cutler* v. *Putnam Light & Power Co.,* 80 Conn. 470, 68 Atl. 1006, are distinguishable upon similar grounds; in the first the plantiff when he came in contact with an electrified wire of the defendant was performing a duty which rested upon him as one of its employees and in response to a direct order to do so, and in the second the plaintiff was engaged in working

upon wires of his employer which were upon the same pole as the electrified wire of the defendant, contact with which caused his injuries; and in each case no claim was made or hardly could be made that the defendants were not bound reasonably to anticipate that a person performing such work as were the plaintiffs might come in contact with the wire.

. There was no ground upon which the defendants could be held liable in nuisance. Recovery upon the basis of a private nuisance can be had only by one who is injured in relation to a right which he enjoys by reason of his ownership of an interest in land. *Webel* v. *Yale University*, 125 Conn. 515, 525, 7 Atl. (2d) 215. As regards a public nuisance, passing the fact that the highway had not been legally opened to traffic and that the plaintiffs were not on the bridge in the exercise of rights as members of the general public but only in connection with the work necessary to complete it, the circumstances we have mentioned afforded no basis upon which it could reasonably be held that the presence of the unguarded feed wire had a natural tendency to create danger or inflict injury upon persons or property; *Andrews* v. *Bristol*, 120 Conn. 499, 502, 181 Alt. 624; *Brock-Hall Dairy Co.* v. *New Haven*, 122 Conn. 321, 326, 189 Atl. 182; for that danger would only exist as a result of an unusual combination of circumstances contributing to the result.

It may be assumed that Hassett and Pearce were familiar with the situation at the bridge by reason of oversight which, as representatives of the highway department, they had exercised in connection with its construction and that of the highway in its vicinity, and that they must have known that the feed wire carried electricity of so high a voltage as to be liable to cause serious injury should it be deflected in such a way that it would come in contact with any person.

But going upon the bridge to make the measurements as they did would not constitute contributory negligence as regards the injuries they suffered. A conclusion that they were guilty of such negligence could be based only upon something done or not done by them which was a contributing cause to the bringing of the tape in contact with the feed wire and with themselves. That was the hazard upon the basis of which their negligence was to be determined. Restatement, 2 Torts, § 468; *Hinch* v. *Elliott,* 119 Conn. 207, 210, 175 Atl. 684; *Kryger* v. *Panaszy,* 123 Conn. 353, 358, 195 Atl. 795. The finding discloses no conduct upon their part which contributed to bring about the injury due to that hazard and the conclusion of the trial court that they were not guilty of contributory negligence was correct.

Where one voluntarily undertakes work when he knows or should know that risk of injury is naturally incident to it, appreciates that risk and realizes that unless he takes steps to protect himself he is liable to suffer such injury, he may be found to have assumed that risk. *Freedman* v. *Hurwitz,* 116 Conn. 283, 287, 164 Atl. 647; *Dean* v. *Hershowitz,* 119 Conn. 398, 412, 177 Atl. 262. But unless one has an opportunity to observe and realize the danger from an extraordinary risk which is not naturally to be anticipated from the nature of the undertaking upon which he is engaged, he does not assume that risk. *Messinger* v. *New York, N. H. & H. R. Co.,* 85 Conn. 467, 475, 83 Atl. 631; *Baer* v. *Baird Machine Co.,* 84 Conn. 269, 273, 79 Atl. 673; *Belevicze* v. *Platt Bros. & Co.,* 84 Conn. 632, 637, 81 Atl. 339; *Tenney* v. *Baird Machine Co.,* 87 Conn. 119, 126, 87 Atl. 352. It may be that Pearce and Hassett, by undertaking the work of measuring for the fences, could be held to have assumed all risks naturally incident to that work, but it could not be held that

they assumed the risk of so unusual an occurrence as the interception of the electric current in the feed wire and its deflection to them in the way that occurred. *Wray* v. *Fairfield Amusement Co.*, 126 Conn. 221, 227, 10 Atl. (2d) 600. The trial court was right in its conclusion that they did not assume the risk of the injuries suffered.

The other claims of error are not such that their present consideration would be of value, should there be another trial of the actions.

There is error; the judgment is set aside and a new trial is ordered.

In this opinion the other judges concurred.