## ABIGAIL CLUETT
### *vs.*
## MARGARET K. TOOLE ET AL.

Superior Court      New Haven County      File No. 59965

MEMORANDUM FILED JUNE 2, 1942.

*Campner, Pouzzner & Hadden,* of New Haven, for the Plaintiff.

*Hoyt & Mulvihill,* of New Haven, for the Defendants.

Memorandum of decision in action involving maintenance of restaurant entrance.

FOSTER, J. On March 24, 1940, at about 4 p.m., the plaintiff fell and was seriously injured upon leaving a building

owned by the defendants and operated by their lessees as a restaurant. The injuries suffered by the plaintiff were so serious that, if judgment be rendered in her favor, the amount of damages awarded will necessarily be of a substantial amount. If judgment be rendered against the plaintiff, her loss will be equally great. In another way the determination of the case is also important to the defendants. If judgment be awarded against them, they will not only be liable for the plaintiff's damages, but they will necessarily be subject to heavy expenses in the reconstruction of the entrance of the building at which the plaintiff fell. The court is, therefore, warranted in expressing in some detail the reasons for the conclusion reached.

The complaint is in two counts, alleging that the defendants maintained the entrance to the building in such manner as to constitute a nuisance, and in that they were guilty of negligence; which nuisance or negligence was or were a proximate cause of the plaintiff's injuries.

The plaintiff in the first count of her complaint claims that on March 24, 1940, and for a long time prior thereto, the defendants were the owners of the building and premises known as No. 94 College Street in New Haven; that on that day and for a long time prior thereto, the defendants leased such premises to one Esther Kuritch, who conducted thereon a public restaurant and tavern; that the only public means of exit from the premises was by way of a revolving door which opened directly onto the public sidewalk in front of the premises; that the floor level of the revolving door was approximately six inches (admittedly five inches) higher than the level of the adjoining sidewalk and that there was a single six-inch (admittedly five-inch) step between the two levels; that at about 4 p.m. on that day the plaintiff was an invitee on such premises and had had dinner in the restaurant; that as the plaintiff was leaving the restaurant she passed through the revolving door and fell and received injuries, because of the difference in levels of the floor upon which the door revolved and the sidewalk; that the difference in levels between the floor and the sidewalk presented an inherently dangerous condition in that it was located at a place where proper and safe construction required a level footing, in that it was so constructed as to create a dangerous condition and a situation calculated to cause injury to persons lawfully using the same, in that its location close to the revolving door concealed it and made it dangerous to persons using the door and in that it was a single

isolated step not marked in any way to attract the attention of persons lawfully on the premises; that the defendants knew, or should have known, that a step, located as was the step in question, was a menace to life and limb and created an inherently dangerous condition and knew the purpose for which the premises were leased, and that such condition made the premises unfit for the purposes for which they were leased, and knew, or should have known, that a dangerous condition existed and was maintained on the premises, and that such condition created a nuisance; that the plaintiff by her fall suffered a compound comminuted fracture of the right ankle with complete break of the medical malleolus, fracture of the posterior portion of the tibia at its lower end, fracture of the fibula, comminute for a distance of about two inches from its lower end, complete dislocation of the astragalus, parting of the ankle ligaments, severe nervous shock, great pain and suffering.

In the second count of her complaint the plaintiff claims that in creating such conditions the defendants were guilty of negligence. The defendants deny that they maintained a condition in their building that constituted a nuisance, and they deny that they were guilty of any negligence in maintaining their premises in their then condition, and they allege that the plaintiff was guilty of contributory negligence that was a proximate cause of her fall and subsequent injuries. The plaintiff denies that she was guilty of any negligence contributing to her fall and injuries.

Joseph Howard Candee is a photographer and, though not an engineer, he makes measurements. He has for many years acted as a witness in cases and has acquired full confidence of the courts in his accuracy and his impartiality. His testimony in this case is undisputed. His description of the door and step is as follows:

"Mr. Hadden:

Q—Now, Mr. Candee, will you give us the measurements that you made of this doorway?

A—The doorstep from the sidewalk up to the doorway is a five-inch riser. Then the cement step is nine inches across the top, which is of a grayish material—cement I should say. Then there is a one and one-half inch black stripe that goes around of composition that is on the floor. As that on the floor is in blocks there are six-inch diameter red blocks as

shown in this photograph, with white division lines between them.

Q—Point that out again, please.

A—These blocks are just inside the doorway with white division lines between them.

Q—What are they made of?

A—Red composition, and the opening in the doorway is 44¾ inches, and the door, itself—the wooden part—is 30½ inches. Then there is a flange of pliable rubber and canvas which is 2½ inches wide. It is 43 inches between the doors measuring from outside to outside, the door without the flange. The grab handles are 42½ inches from the floor. The glass in the doors is 18½ inches in width and 51¼ inches in height. The bottom of the glass is 24 inches above the floor. The wood flange on the outside of the door is 7¾ inches. As I said before, there are four sections of the door. Those are all the measurements that I took on that case.

Q—Now, this door, Mr. Candee, you say has four sections?

A—Yes.

Q—Which create four compartments, so to speak?

A—That's right.

Q—It is a revolving door, and what part of the door is fastened to any other object?

A—The center of the door.

Q—The center at the top?

A—At top and bottom on a pivot like.

Q—Did you measure how far it is from where the door is fastened on the bottom to the front edge of the step?

A—No; I did not, but that would be about two inches and a half to three inches beyond the width of the door and flange, which makes about 35 to 36 inches from the center of the door to the outside of the step.

Q—Are you able to tell from your examination there and your examination of the picture how close to the step, itself, the outer edge of that section of the door comes to the step?

A—About 2½ to 3 inches from the noser of that step.

Q—Will you tell us again how far you say it is from where the center of the door is fastened, to the step?

A—Well, the center of the door would be a little bit inside the woodwork around it, but the door, itself, measures 30½ inches in width with a 2½ inch pliable flange, which makes 33 inches.

Q—Now, Mr. Candee, these sections of this door, of which there are four, are each 33 inches wide?

A—Yes, flange and woodwork and glass.

Q—Whatever it may be, they are 33 inches wide?

A—Yes.

Q—And they come, when in the position shown in the photographs A and B, within 2½ to three inches of the down step?

A—Yes.

Q—So that the angle formed by two sections of the door, where the two sections of the door come together at approximately the center of the door, out to the step, itself, is from 35½ to 36 inches?

A—Yes.

Q—And you say the step, itself, is 5 inches high?

A—Yes. That is the riser.

Q—And is the block of cement that forms the step on a level with the floor of the riser and the floor under the door?

A—Yes.

Q—That block of cement is 9 inches across the top?

A—That's right.

Q—And extends entirely across the doorway, and is wider than the doorway?

A—Yes.

Q—There are two pillars on either side that rest on that cement block?

A—Yes, and part of that curvature on that glasswork on that side beyond the pillar on each side, and then there is

probably two or $2\frac{1}{2}$ inches beyond that next to the building there.

Q—But the top of the step is on the same level as the floor under the door in the restaurant?

A—Yes.

Q—And that level is 5 inches above the sidewalk level as one comes out of the door?

A—Yes.

Q—Is the sidewalk in that area immediately adjacent to the step a cement sidewalk?

A—Yes.

Q—Is it the same color as the step itself?

A—No, there is a little variation there. The step itself, is a gray, but it seems to me as though it had a little reddish tint to it. I noticed there was a different tint to the step than there is to the walk.

Q—That is the only difference between the two?

A—Yes.

Q—They are both cement?

A—Yes.

Q—But you say there is a slightly reddish tint to the step that does not appear in the walk?

A—Yes, that's right.

Q—Those grab handles, swing around in a circle the same as the sections of the door?

A—Yes, they are fastened right on the door.

Mr. Mulvihill:

Q—Mr. Candee, do I understand you to say that the depth of this compartment is 35 to 36 inches?

A—From the center to the outside of the flange, yes.

Q—Would that be the depth of each compartment?

A—Oh, 35 to 36—excuse me. The door, itself, is $30\frac{1}{2}$ and the flange $2\frac{1}{2}$, making practically 33 inches in the door, itself. Out to the edge of the step is where the 35 to 36 is.

Q—When you say the flange, you mean the rubber flange attached to the woodwork of it? This quadrant there is 2½ inches in width?

A—Yes, this rubber and canvas pliable.

Q—When the door is open and any one of these quadrants are at right angles with the sidewalk, the distance between the rubber flange and the edge of this concrete step is 2½ to 3 inches, is that right?

A—Yes.

Q—That is when the door is at right angles?

A—Yes.

Q—How many grab handles are there?

A—As I recall it, there are two.

Q—Did you make measurements of the one nearest the floor above the floor of the restaurant and the one above that?

A—42½, the one nearest the floor; the one upper is 47. 47 for the upper one; 42½ for the lower one.

Q—Do these grab handles extend the entire width of the door?

A—Well, very nearly.

Q—You say the glass is transparent?

A—Yes.

Q—I understood you to say that the floor of the restaurant is made up of cement blocks red in color?

A—Well, I don't know that they are cement in the floor. It is some kind of composition.

Q—What is the color?

A—It is two colors inside. The colors that I speak of are in the entry-way by the door—the reddish, and inside is a larger block that is kind of a reddish, and then another one, black.

Q—There are red blocks within the four quadrants as the doors revolve?

A—Yes.

Q—Under the door?

A—Yes, with a white stripe between them and a black border outlining them.

Q—Where does this black border extend? The entire width of the doorway from side tò side?

A—Yes, especially across the front.

Q—Then I understood you to say that the cement step is 9 inches. Am I right on that?

A—Yes, the tread part.

Q—The tread part is 9 inches?

A—Yes.

Q—And it has a reddish tint?

A—Well, slightly reddish. It is a little different tint than the sidewalk.

Q—And the sidewalk is white?

A—Well, it is a gray cement.

Q—That black border you speak of there is flush with the door?

A—Yes, as I recall it is all flush there, the blocks and the border and the top of the tread.

Mr. Hadden:

Q—Is it solid beneath this glass in each one of these sections of the door?

A—Yes.

Q—Made of wood?

A—Yes.

Q—That glass comes down to within 24 inches of the floor?

A—Yes."

The plaintiff, a woman 59 years of age, had lived at the Hotel Taft for ten years. On the afternoon in question, an Easter Sunday, she went just across the street from the Hotel Taft, accompanied by a lady friend, to the restaurant in the building of the defendants and there dined. Upon leaving the building the plaintiff walked ahead of her friend. She pushed the revolving door, causing it to revolve. She testi-

fies: "I was looking ahead of me but saw no step." As she put her right foot forward, assuming that it would strike the same level as that from which she stepped, the right foot went to the level five inches lower than that from which she had stepped, and she fell and was injured.

The plaintiff was an invitee upon the premises. If she is to recover judgment in this case, it must be on the ground of negligence of the defendants—not upon the ground of their maintaining a nuisance.

"There was no ground upon which the defendants could be held liable in nuisance. Recovery upon the basis of a private nuisance can be had only by one who is injured in relation to a right which he enjoys by reason of his ownership of an interest in land. *Webel vs. Yale University,* 125 Conn. 515, 525." *Hassett vs. Palmer,* 126 Conn. 468, 476. See, also, *Croughwell vs. Chase Brass & Copper Co.,* 128 id. 110.

Having disposed of the question of nuisance we consider the question as to whether the defendants were guilty of negligence in constructing and maintaining this entrance as it existed on the day in question. In examining decided cases we find that construction similar to that in question is quite common; from the evidence we find somewhat similar construction existed in New Haven, where this building is located. And we also find that many persons have fallen on steps somewhat similar to the step here considered. The mere fact that one falls on steps—the mere fact that one falls downstairs—does not prove that the construction and maintenance of the steps or stairs constituted negligence.

Mr. Mott, a builder, an expert witness called by the plaintiff, testified in part as follows:

"Mr. Hadden:

Q—In your opinion is this exit or entrance, which is both as shown in the pictures and as you have found it to exist in May, 1940, reasonably safe for public use?

A—No.

Q—Why not?

A—Because there is a step. In operating the revolving door you have a door before you and you have to think of a door in the rear. You take hold of the door, and you push that door, and you are thinking of nothing else but the re-

volving door, and you are looking invariably straight ahead. You don't look down, because you don't have much of a chance to look down, because your body is rather close to the door, and consequently all you are thinking about—at least, all that I thought about—was opening that door, and before you really get through the door, you are ready for a step down to the sidewalk.

Q—You mean there is a step or you are ready for a step?

A—There is a step there.

Q—Is the location of that step in the position that it is in with relation to the door what causes your opinion that that exit way is unsafe for public travel?

A—Because you step down. You are forced to step down before you hardly get out of the doors.

Q—I just want to summarize, Mr. Mott. Is it the location of that step down so close to the revolving door that caused what you have described as an unsafe condition?

A—Yes.

Q—Now, in leaving that restaurant, did you personally have any experience with that step? Just answer that yes or no.

A—Yes.

Q—What experience did you have with it?

A—While going out through the revolving doors I did not trip but where I expected to step level, I stepped down, and it jolted me, and I took several steps forward toward the middle of the sidewalk.

Mr. Mulvihill: .

Q—When did you trip? What date? About when?

A—Oh, I don't know exactly. I went in there after the remodeling was made, as I say, a week or ten days afterwards.

Q—Night or day?

A—In the evening.

Q—What time in the evening?

A—We went in there for dinner, I should say around seven or half-past seven, and came out.

Q—You went in at half-past seven and came out at half-past eight or nine?

A—Yes.

Q—When you were coming out the revolving door, did you look down to see if that step was there?

A—I did not.

Q—That was the reason you tripped, wasn't it?

A—Well, it is rather difficult to look down.

Q—Is that the reason you tripped?

A—No, I tripped because I expected to go out on a level. Instead of that there was a step there.

Q—In other words, you thought, when you left the restaurant that particular night after the alterations had been finished, that the level of the floor of the restaurant was on the level with the sidewalk?

A—No, I didn't think that, but I did expect it to be level until I got outside of the doors.

Q—That is what I mean. Outside of the doors would mean outside on the sidewalk, wouldn't it? Out on the sidewalk?

A—Yes.

Q—In other words, you expected that the floor of Kaysey's Restaurant was the same grade as the sidewalk, when you went out?

A—I didn't get that, quite.

Q—You thought the level of the restaurant floor was the same level as the sidewalk when you went out? That's what you thought?

A—If I recall—could I answer that in my way?

Q—Answer the question. That is very simple. I am asking you if you thought, when you went out that particular night a week or so after the alterations had been made.

A—A week or ten days, yes.

Q—About 9 o'clock in the evening, whether you expected to find the level of the sidewalk the same level as the restaurant floor?

A—Well, I didn't expect it. In fact, I was not thinking.

Q—You were not thinking about it at all?

A—No, I was thinking of the doors, to get out through the doors.

Q—Well, there are entrances to public buildings here in the City of New Haven, theatres, hotels, with entrance to the sidewalk not on the same level with the hotel or theatre? Is that so?

A—Theatres? Steps?

Q—Yes, public buildings.

A—Yes, public buildings but not theatres.

Q—How about the step at the Shubert? It is a step up, isn't it?

A—When you leave the sidewalk, yes, to get into the vestibule.

Q—There is no question in your mind, Mr. Mott, that in this and other cities there are a great many public buildings where they have a single step at the entrance to stores, public buildings, hotels and the like, to make up the difference between the grade and the sidewalk and that of the floor of the public building?

A—There are very few.

Q—Very few?

A—Very few.

Q—Are you acquainted with the Anchor Spa on Chapel Street, a couple of doors from Kaysey's?

Mr. Hadden: On Chapel Street?

Mr. Mulvihill: College Street.

A—Well, I haven't noticed particularly.

Mr. Mulvihill:

Q—How about the Mary Oliver store on the corner of College?

A—It is an entirely different condition.

Q—Is it a step up?

A—Yes.

Q—How about the Roger Sherman Spa on the same street right next to the moving picture theatre, the Roger Sherman?

A—There is a step there, but there is no obstruction.

Q—There is a step up? That is all I am asking you, from the sidewalk?

A—Yes.

Q—How about the Greyhound Bus on the other side next to the Hotel Taft where the people go in to get the bus?

A—There is a step there, yes.

Q—How about the Professional Building next to the Annex of the Hotel Taft? Is that a step up?

A—Several steps.

Q—How many?

A—I would say there were three.

Q—How about along the building opened up by Michaels in 1941 at Christmas? Is there a single step up on the Temple Street side of that building?

A—Yes.

Q—There is a step up there, isn't there?

A—Yes.

Q—How about your own building? You have a step up in your own building, haven't you?

A—My office?

Q—Yes, at 440 Elm Street.

A—Yes, I have a step there.

Q—And the concrete is the same color as the step, isn't it?

A—Yes, but it—

Q—That is all I am asking.

By the Court:

Q—How far is the door from the top of the step in your building?

A—About a foot."

Mr. Millard Matthias, a builder, an expert witness called by the defendants, testified in part as follows:

"Mr. Hoyt:

Q—In your opinion is the doorway at 94 College Street reasonably safe for use by the public?

A—In my opinion it is reasonably safe.

Mr. Hadden:

Q—My question is, will you tell the court if there is any reason why that door could not have been placed back four feet, and a vestibule left before a customer coming out would come to the step?

A—Well, if that door was back four feet, you would have a ramp. It would be too steep. It would be as dangerous as you claim this one is."

In discussing the structural condition, plaintiff's counsel had frequently assumed that the door opens $2\frac{1}{2}$ to 3 inches over the nose of the step. It should be borne in mind that, while in its revolution the edge of the door comes to within $2\frac{1}{2}$ to 3 inches of the nose of the step, the center of the revolving door is 35 to 36 inches from the nose of the step; so, after starting to push the door open, one coming out of the door may upon looking down see the space about 35 to 36 inches before reaching the step. Plaintiff's counsel urged that a reasonable inference from the testimony of defendants' expert witnesses is that the construction of the entrance and door was so planned for the purpose of saving space within the res- taurant. Even if this be so, such purpose does not make illegal the entrance or the door; nor is such an inference of any weight in determining the question of negligence of the defendants. How far back from the nose of the step does plaintiff's counsel claim the door should have been located? If the door had been 20 feet back of and away from the nose of the step, and the plaintiff had proceeded forward from the door as she testifies she did ("I was looking ahead of me but saw no step") and the plaintiff had suffered the same injuries as here alleged, what act or condition could then be said to have constituted negligence of the defendants?

Injuries caused by passing from one plane to a lower plane

are frequent. They may arise from passing down sloping planes, by passing down one step or many steps. It is common experience that from childhood to old age people fall down stairs. No step or stairs is or are absolutely safe. It is, however, the legal duty of one constructing or maintaining a step or stairs to so construct and maintain them that they are reasonably safe for those using them in the exercise of due care. It is the legal duty of one using the step or door to exercise reasonable care. Reasonable care is that care which a reasonably prudent person would use under like circumstances and conditions as those surrounding persons whose conduct is under consideration.

The defendants present cases in support of their claims that the condition here existing was reasonable and safe, and that the fall of the plaintiff was due to her contributory negligence. "Persons entering [the defendant's] building were charged with knowledge that they were not entering from a perfectly level sidewalk, and that generally the floors of buildings are not of precisely the same elevation as the sidewalk, even where it is level. Customers entering or leaving stores cannot be unmindful of these almost universally prevailing conditions. Owners of buildings have a right to proceed in their constructions in view of this common observation on the part of the public and assume in the actions of those who may frequent their buildings the exercise of ordinary circumspection as to their footing." *Hoyt vs. Woodbury,* 200 Mass. 343, 345.

"Entering and leaving stores, halls, .... office buildings, and other buildings .... adjoining surfaces are frequently at different levels, and the difference in level has to be overcome by one or more steps of greater or less height or by some other device. ...We cannot think that such a construction is of itself defective or negligent....Moreover, the plaintiff had gone into the room, without stumbling, over the same step where she fell when coming out. It would seem that the accident was due, to say the least, quite as much to her own inattention as to the presence of the step." *Ware vs. Evangelical Baptist &c. Society,* 181 Mass. 285, 286.

"A step between one level and another does not ordinarily warrant a finding of negligence....Differences in grade are especially to be expected at the division line between a public sidewalk and private property. One has no right to expect

that the height of the riser will be uniform. 'People cannot expect upon land obviously in private ownership next a street the same condition that they might anticipate in a public sidewalk.' " *Abrahams vs Zisman*, 293 Mass. 375, 376.

"It is not enough that the construction of the floor was not standard but it should further be shown that the deviation from the standard resulted in an unsafe and dangerous condition. That was not shown. True an expert witness, who was thoroughly examined, gave his opinion that it was dangerous but he based his opinion solely on the theory that all store floors should be level. While that is some testimony, it is not entitled to much consideration in the light of common knowledge that store floors as well as other places of public use very frequently have sloping floors quite similar to the one in question." *Kelly vs. Loft, Inc.,* 124 N.J.L. 185, 186.

"The happening of the accident does not and cannot of itself be evidence of faulty construction. Of course a condition may be so bad that its danger is readily apparent, but in the authorities hereafter cited it will be noted that this court has repeatedly held that although a place may be dangerous and an avoidable accident has happened, yet the owner is not liable for faulty construction simply because the accident could have been avoided, unless it be one which could reasonably have been anticipated in the light of experience. Continued use for a long period of time without any accident negatived negligence arising out of claimed faulty construction." *De Salvo vs. Stanley-Mark-Strand Corp.,* 281 N.Y. 333, 338.

In an action to recover for injuries received in consequence of an obstacle upon the sidewalk, of such a character that the attention of all who passed that way would naturally be drawn to it, and their experience of its effect in obstructing travel be substantially the same, evidence that others passed it without harm, when it was in the same condition as at the time when the plaintiff received her injury, is admissible to show that it was not dangerous to one using ordinary care. *Calkins vs. City of Hartford,* 33 Conn. 57.

In the present case it appears that many thousands of people have passed over the step in question and have entered and left the door in question without mishap or injury, and that only the expert witness introduced by the plaintiff had a slight mishap.

"Upon entering the toilet compartment, she opened the

door and ascended to the higher level without difficulty or mishap. Thus, she had actual notice that the step was there. Her eyes unquestionably saw the step up into the toilet, else she would have stumbled. Had she been blind, her sense of touch must have disclosed to her the elevation, for she was compelled to raise her foot to reach it. On leaving, had she looked before plunging blindly into space, she must again have seen the floor below. The door itself was a warning that this very condition must exist....Her duty required her to observe what was so clearly visible. Her testimony shows her thought-less inattention to her surroundings, her neglect to look, and her careless assumption that the floor levels were the same. Careless persons cannot be prevented from hurting themselves.

"....No extraordinary situation confronted her; her facul-ties were not in any way impaired. The result cannot be foreseen if it be admitted that mere inattention or lapse of memory can excuse negligence. Such a rule would invalidate all sense perceptions, and would effectively put an end to the law of contributory negligence in the practical administration of justice." *Wessner vs. Blue Ridge Transportation Co.,* 338 Pa. 161, 164.

"This accident happened in the day time. Plaintiff alleges that this was her first visit to the booth, and to some extent relies upon this fact as a reason or excuse for her not guarding against the effect of the door's reaction, after being drawn in to allow her exit; and, also, for not bearing in mind the presence of the step-off in the floor. This position is without persuasive force.

"Being in full possession of her senses, of sight and touch, and having safely entered the booth in the day time, argues convincingly that plaintiff fully appreciated and had knowledge of the physical set-up thereabout, and well knew what she must do in order to assure unto herself safe return from the booth into the larger apartment of the room, which, after all is said, should have been but a repetition of her acts and movements when entering the booth....She, of course, also knew, or is charged with knowing, that if unguardedly she stepped from the higher floor to the lower, there would also be danger of losing balance and falling heavily.

"Plaintiff fell and was injured solely from her own negli-gence and lack of care. She is, therefore, without any cause or right of action against defendant in connection therewith."

*Burdeaux vs. Montgomery Ward & Co.* (La. App.), 192 So. 728, 730.

"It is clear that the conditions at the entrance were open and obvious, and only a half hour before the plaintiff's injury she had passed over the step and through the door." *Sterns vs. Highland Hotel Co.,* 307 Mass. 90, 95.

The conclusion that plaintiff's decedent was negligent in that he failed to make reasonable use of his senses in passing the lavatory which he sought in defendant's theatre, and where he had been before, and in opening the door to a stairway and proceeding to descend the unlighted stairs, was reasonably reached upon the facts. *Knapp vs. Connecticut Theatrical Corp.,* 122 Conn. 413.

"Indeed, it would seem reasonable that as when she entered from daylight the lighting was sufficient to enable her to find her seat unaided and to see and step up on the platform, the same lighting would have enabled her to see even better when leaving." *Miller vs. Poli's New England Theatres, Inc.,* 125 Conn. 610, 613.

"If we would concede that defendant was guilty of negligence, we think that [the plaintiff], under her own testimony was guilty of contributory negligence as a matter of law. She stated that she was looking ahead when she pushed open the door and 'went out in a hurry.' In explanation of her failure to look she said: '....I didn't know the step was there.' She testified further as follows:

" 'Q—Well, you had your eyes straight ahead of you?

" 'A—I was looking where I was walking. I had my eyes out in the vestibule, where I was going to go out....

" 'Q—And you didn't look down to see if there was a step there or not, did you?

" 'A—I had my arms full, but I was looking down....

" 'Q—But I say you didn't look at your feet?

" 'A—I didn't look at my feet; I looked right through the door....

" 'Q—Then, you stepped out, taking it for granted that there wasn't any there, didn't you? You took it for granted as you pushed the door open that there wasn't any step there?

" 'A—Well, yes. . . .

" 'Q—. . . . If you had pushed it open and looked down at it, you could see that there was a step there?

" 'A—I don't know whether I could or not.

" 'Q—You didn't look to see?

" 'A—I was looking out; I didn't look to see.' " *Hixen-baugh vs. J. G. McCrory Co.* (Pa. Super.), 20 Atl. (2d) 910, 912.

"This attempted avoidance of the charge of want of care on her own part is fallacious, in that it is based upon what she did not observe on entering the store and upon what she says she was not called upon to notice at that time, rather than upon what was in plain sight and what she could have observed upon opening the screen when leaving the store. Upon opening the screen at that time, if she had observed, she would have seen the step-off to the sidewalk before stepping forward. On reaching the screen door, she pushed it open and stepped forward without looking, with the inevitable result in such cases—a hard fall and bodily injury. The proximate cause of her fall and injury was her inattention, and not because the step-off was dangerous in itself or in the conditions surrounding it. . . .

"In the present case, the difference in level was between the sidewalk and the entrance to the store, and, as was stated by the court. . . . plaintiff had no right to assume that the floor of the store building was on the same level as the sidewalk. But, aside from this, she had entered the store from the street only a short time before, and knew of the difference in the level of the sidewalk and the floor of the store." *Watkins vs. Piggly Wiggly Bird Co.*, 31 F. (2d) 889, 891.

I find that the defendants were not guilty of negligence alleged in the complaint.

I find that the plaintiff was guilty of contributory negligence which was a proximate cause of her fall and injuries as alleged in the first special defense appearing in the answer of the defendants.

Judgment is rendered in favor of the defendants against the plaintiff.