DAGMAR R. H. LASPINO, ADMINISTRATRIX (ESTATE OF JOHN HOYT) *v.* THE CITY OF NEW HAVEN

VINCENT GULLO, ADMINISTRATOR (ESTATE OF ROBERT GULLO) *v.* THE CITY OF NEW HAVEN

MALTBIE, C. J., BROWN, JENNINGS, ELLS AND COMLEY, JS.

Argued April 7—decided July 5, 1949.

*Alfred F. Celentano* and *William L. Beers,* with whom, on the brief, was *George G. DiCenzo,* for the appellant (defendant).

*Edward L. Reynolds,* with whom were *Louis Shafer* and *John J. Kinney, Jr.,* for the appellees (plaintiffs).

BROWN, J. In these actions, tried together, the plaintiffs, administratrix and administrator respectively, sought to recover for the deaths of their decedents, alleged to have been caused by a nuisance maintained by the defendant. The two deceased were drowned when a homemade boat which they occupied capsized and sank in a waterway of a partially developed park of the defendant city. In each case the jury rendered a verdict for the plaintiff, the defendant's motion to set it aside was denied and the defendant has appealed. The question for determination is whether the jury could reasonably have found upon the evidence that the construction, maintenance and supervision of the waterway by the city, incident to the development of this unfinished park, constituted a nuisance which caused the death of the two boys.

It is undisputed that the work done by the city in connection with the property was intentional. This is to be had in mind in considering a case of this nature. "Nuisance is a word often very loosely used; it has been not inaptly described as 'a catchall of ill-defined rights.' In its proper use, however, it involves as an essential element that it can be the natural tendency of the act or thing complained of to create danger and inflict injury upon person or property. *Hoffman* v. *Bristol,* 113 Conn. 386, 389, 155 A. 499." *Gonchar* v. *Kelson,* 114 Conn. 262, 271, 158 A. 545; *Brock-Hall Dairy Co.* v. *New Haven,* 122 Conn. 321, 326, 189 A. 182; *DeLahunta* v. *Waterbury,* 134 Conn. 630, 634,

59 A. 2d 800. "To constitute a nuisance in the use of land, it must appear not only that a certain condition by its very nature is likely to cause injury but also that the use is unreasonable or unlawful." *Beckwith* v. *Stratford,* 129 Conn. 506, 508, 29 A. 2d 775. Whether or not the particular condition of which the plaintiffs complain constituted a nuisance "does not depend merely upon the inherent nature of the condition, but involves also a consideration of all relevant facts, such as its location, its adaptation to the beneficial operation of the property, the right of members of the public to go upon the land adjacent to it, and the use to which they would naturally put that land." *Balaas* v. *Hartford,* 126 Conn. 510, 514, 12 A. 2d 765; *Prifty* v. *Waterbury,* 133 Conn. 654, 658, 54 A. 2d 260. To warrant the plaintiffs' verdicts, it must not only appear that there was evidence sufficient to establish the existence of a nuisance within these principles but that such nuisance was the proximate cause of the death of the plaintiffs' decedents. *Beauton* v. *Connecticut Light & Power Co.,* 125 Conn. 76, 81, 3 A. 2d 315; *DeLahunta* v. *Waterbury,* supra.

We summarize such of the material facts as are undisputed. About 1921 the city acquired a relatively level 200-acre tract of meadow land approximately rectangular in shape, which abutted southerly on Congress Avenue in New Haven and Orange Avenue in West Haven, and on other streets on its three remaining sides. The West River flowed southerly through this area in a natural channel winding from side to side, augmented by a branch coming in from the west, and after passing under Orange Avenue it emptied into Long Island Sound. The city adopted a plan for the development of this tract as West River Memorial Park in honor of those who served in the first world war. The plan called for the extensive alteration of

the course of the river. Pursuant to the plan, for several years in the late twenties and early thirties the city's park department, by dredging and filling, constructed a straight canal 150 feet wide extending from north to south near the middle of the tract for almost its entire length, with a wider basin at each end. A new channel for the river was made along the westerly edge of the property and the branch from the higher watershed farther west flows into it. At the southerly end of this channel is an outlet into the south basin of the canal and from there the water flows out under Orange Avenue to the Sound. A little north of the halfway point of the canal is a channel called "the break." This connects with the new course of the river and through it water flows from west to east into the canal. The confluence of these two waterways had existed at this place before any change was made, but as a result of the reconstruction the break, which formerly had a uniform width of about 100 feet, was tapered, commencing at a point 90 feet west of the junction, to a width of 50 feet where the waterways come together. Some dredging was done in the break and the canal is from seven to eleven feet deep where it flows in. The south bank of the break is rather abrupt and a couple of steps high; the east bank of the canal is in places two feet high and perpendicular. The plan called for a footbridge over the break at this point, and elsewhere in the area for the erection of certain monuments, the laying out of paths, and landscaping. None of these things have been done. A five-foot storm sewer taking the surface water from nearby streets empties into the canal on its east side a short distance north of the break. Aside from the changes referred to above, the land was left in its natural state; at the time in question it had some marshy areas and in places was overgrown with high grass and bushes.

At Orange Avenue tide gates were installed which open and close automatically. There is a normal rise and fall of tide in this region of several feet. The rising tide upon reaching a certain level causes the gates to close. While they are closed, tide water is prevented from coming in, and meanwhile the normal downstream flow of the river is impounded by the gates. When the tide recedes, the gates open and the river resumes its natural flow to the Sound. Under normal conditions, this functioning of the tide gates restricts the variation in the depth of the water in the channels to eighteen inches instead of permitting the full tidal variation of several feet. The park has not been completed and has never been formally opened or dedicated to the public, but it is open to the public. It is only partially fenced and there are no signs forbidding trespassing. Young people and children have been accustomed to play in the open area. The park department's caretaker lives on the premises and regularly drives around the tract three times a day. Whenever he has found children there, if they appeared too young to take care of themselves he would cause them to leave, and the policeman on that beat has done the same. In a part of the city lying east of the park is a tenement district housing many children.

On April 4, 1947, the decedents, John Hoyt and Robert Gullo, each 14½ years old, together with three other boys, 15, 16 and 17 respectively, entered the park from Orange Avenue, intending to pitch a tent on the south bank of the break at its junction with the canal. As they walked along they found a small homemade boat six feet long on the west bank of the canal. They set up their tent as planned, attached a small rope to the boat and fastened the other end to a stake driven in the bank. Then, with the aid of makeshift paddles and the rope, they used the boat to ferry either one or

two boys at a time back and forth between the banks of the break. During the process, water gathered in the bottom of the boat, necessitating the emptying of it between trips. On the final trip the two decedents were returning to the south bank. The boat filled with water and began to sink. The rope broke, permitting the boat to drift out into the canal, and both boys disappeared beneath the surface and were drowned.

In essence, the plaintiffs' claim is that the city, by constructing the tide gates and the storm-water sewer and by narrowing the channel of the break as it did, produced at the break "a very strong current," "a very hard underwater current," which was unnatural and which under all of the circumstances created a nuisance. Witnesses for the plaintiffs described the current in the words quoted, while witnesses for the defendant stated that the current was almost imperceptible. Assuming that the jury were warranted in accepting the former testimony as true, that evidence is without significance unless they could further properly have found that the work done by the city had materially increased the force of the current beyond that of its former natural flow. There was nothing in the evidence to warrant the inference that the storm sewer could have been a factor in such an acceleration of the current through the break. Had there been evidence, of which there was none, that water was emptying into the canal through the storm sewer, or even that there had been a recent rainfall sufficient to render that probable, in so far as effect on the current in the break is concerned the only natural result which could ensue would be a raising of the water level in the canal, with a consequent decrease rather than increase in the flow of that current. There was no evidence as to the nature of the current before the changes, and there was a total lack of any as to the

relative water levels in the break and in the canal as of the time before and the time after the changes, particularly with relation to that portion of them at the confluence, which continued in its original location. Furthermore, there was no evidence as to the tidal conditions on the day of the accident. Upon this state of the record, the jury could not reasonably have found that the work done by the city, either in utilizing the tide gates or in narrowing the break, had materially increased the force of the current therein. In other words, they could not find that the natural flow of the current had been materially altered.

Even though the conclusion claimed by the plaintiffs had been warranted, the verdicts in their favor could not be sustained. This is so because there is no evidence to support a finding of the two essentials of a nuisance. These, as appears from the authorities cited above, are that the condition complained of by its very nature was likely to cause injury and that the use made by the city of its property was unreasonable or unlawful. Manifestly what the city had planned and done, looking to the eventual development and opening of this land as a public park, was neither unreasonable nor unlawful. It is equally clear that there was no evidence that the very nature of the condition was such that it was likely to cause injury. The city could not have anticipated that this body of water would be used for boating during the first week of April. There was no evidence that either boats or facilities for boats were provided by the city or that the waterway had ever been used for boating before. That teen-age boys would drown in it in using an inadequate homemade boat which they had found in the undeveloped area was a contingency which cannot be said to have been a "danger" likely to arise from the very nature of the current in the break under the

conditions existing, even if the current had been increased by the changes made. See *Brock-Hall Dairy Co.* v. *New Haven,* 122 Conn. 321, 326, 189 A. 182. The tragedy was due not to a danger arising from a nuisance but to one which could "only exist as a result of an unusual combination of circumstances contributing to the result." *Hassett* v. *Palmer,* 126 Conn. 468, 476, 12 A. 2d 646; *Orlo* v. *Connecticut Co.,* 128 Conn. 231, 242, 21 A. 2d 402. The distinction between the present case and one where the condition complained of by its very nature was likely to cause injury is clearly illustrated by the factual situation held to constitute a nuisance in *Hoffman* v. *Bristol,* 113 Conn. 386, 155 A. 499. There the defendant city at a bathing beach in its public park maintained a diving board about four feet above shallow water which was usually so opaque that its lack of depth was not discernible to one standing on the board, and the plaintiff dived into the water from the board and was injured. See also *Bush* v. *Norwalk,* 122 Conn. 426, 427, 189 A. 608; *Beckwith* v. *Stratford,* 129 Conn. 506, 508, 29 A. 2d 775; *Prifty* v. *Waterbury,* 133 Conn. 654, 655, 54 A. 2d 260.

There is error, the judgment is set aside and a new trial is ordered in each case.

In this opinion the other judges concurred.