JOSEPH DIGGS ET AL. *v.* THE NEW YORK, NEW HAVEN
AND HARTFORD RAILROAD COMPANY

SUPERIOR COURT      FAIRFIELD COUNTY      FILE No. 106964
AT BRIDGEPORT

JOHN ARRIGONE ET AL. *v.* THE NEW YORK, NEW
HAVEN AND HARTFORD RAILROAD COMPANY

SUPERIOR COURT      FAIRFIELD COUNTY      FILE No. 106965
AT BRIDGEPORT

Memorandum filed May 14, 1963 [1]

---

[1] Publication of this decision was determined upon after an appeal to the Supreme Court of Errors was dismissed.

*Philip Reich* and *George Balter,* of Bridgeport, for the named plaintiff in each case.

*Edward J. Donahue,* of Bridgeport, for Cayuga Foundation Corporation, intervening plaintiff, in each case.

*Gregory C. Willis,* of Bridgeport, and *Thomas J. O'Sullivan,* of New Haven, for the defendant in each case.

MacDonald, J. These actions against the railroad were brought by two employees of the Cayuga Foundation Corporation, a general contractor engaged by the state to construct a portion of the Connecticut Turnpike adjacent to the Burr Road Bridge, which crosses over the main line of the railroad in Bridgeport. The actions arise out of an accident which occurred on November 6, 1957, while the named plaintiffs, in the course of their employment by Cayuga to pave the turnpike at or near its approach to the bridge, were holding, guiding or steadying a piece of road-building equipment known as a "fine-grader," which at the moment was hoisted off the roadway and was in the process of being moved by a metal cable suspended from the boom of a crane mounted on a truck. While plaintiffs were thus in contact with the fine-grader and walking or standing on the surface of the highway, the boom of the crane came into contact with a signal wire of the railroad which was suspended from towers and crossed over the highway at a height of fifty-four feet above the surface of the highway at the point of contact. The wire carried 11,000 volts, and the charge of electricity transmitted through the crane boom, cable and fine-grader to the two plaintiffs gave them severe electric shocks and

burns and caused them serious, painful and dis-
abling personal injuries.

The two cases were tried together, commencing
on February 14, 1963, before a jury of twelve with
two alternates, both of whom were called upon
during the next three weeks of trial to replace ailing
jurors. On March 8, owing to personal problems
arising among the remaining jurors, the choice was
presented of either declaring a mistrial or proceed-
ing with the trial to the court without a jury. Upon
stipulation of counsel, the latter alternative was
adopted and the trial continued before the court to
its conclusion.

Out of the many pages of testimony and numer-
ous exhibits, one conclusion seems utterly inescap-
able. That conclusion is that a direct proximate
cause of the plaintiff's injuries was the negligence
of their employer, Cayuga. It was Cayuga who,
under both its contract with the state and the con-
tract between the state and railroad, had the respon-
sibility of making arrangements with the railroad
to shut off the power when necessary "to facilitate
the contractor's operations," and whose employees
failed to make such a request on this occasion,
although several of them, including a foreman, the
crane operator, and the driver of the crane, to say
nothing of the two plaintiffs themselves, apparently
knew that the crane was going to operate in the
vicinity of the wire in question. The crane operator,
who had operated his crane over this bridge with
equipment suspended from the boom on previous
occasions, and who knew or certainly should have
known of the presence of the high-tension wires
over the bridge, was the one who operated the crane
in such a manner as to bring its boom into contact
with the wire fifty-four feet above the highway, and
that despite a five- by eight-inch sign, bolted to the

outside of the crane directly in front of the operator, on which appeared, in red letters on a white background, the words: "This machine not to be operated within 6 feet of power line." How his operation of the crane under the circumstances could be considered other than grossly negligent is difficult to see.

Since the claims of the plaintiffs against Cayuga are governed by the Workmen's Compensation Act, Cayuga's liability to them is not an issue here. However, the part played by its negligence in causing this accident narrows the issues before the court to these: (1) Was the railroad negligent with respect to either (a) its design, installation or location of the wire in question, or (b) the arrangements it made for the protection of those who it should reasonably anticipate might come in contact with it? (2) Was such negligence on the part of the railroad—if any existed, either concurrent with or independent of the negligence of Cayuga—a proximate cause of plaintiffs' injuries? (3) Did any contributory negligence on the part of plaintiffs proximately cause their injuries?

Considering the first category of the first issue, the court cannot find from the evidence that there was any negligence on the part of the railroad with respect to the design, installation or location of the wire in question. There was no evidence that the design of the supporting towers or details of construction or installation were improper, or faulty, except that concerning plaintiffs' claims that the wire should have been located elsewhere—either underneath, or at a greater height above the highway—or that it should have been insulated or shielded in some manner from persons or objects which might come into contact with it at the height of fifty-four feet above the highway. In this con-

nection, plaintiffs introduced into evidence Public Utilities Docket No. 5700, being "Electric Rules, Regulations, Standards and Specifications," calling particular attention to § 60, to the general effect that every utility (including, by admission of defendant, railroads) must use all possible care to protect the public, employees and others from the dangers of electric wires maintained by them. This would be the approximate standard under our common law anyhow, and there is nothing specific in this document, with special reference to §§ 165-168 inclusive, regulating the height of wires above roadways, either under normal conditions of use or during construction.

The electrical engineer called by plaintiffs as their expert expressed the opinion, in response to a hypothetical question, that the installation was not in conformity with good practice, but his reasons were not convincing to the court—nor were his qualifications with respect to experience with railroad transmission lines particularly impressive. Generally speaking, his testimony was that the wire should have been higher above the highway, or under the Burr Road Bridge, underground or encased in armor, or de-energized at the time in question. His testimony was contradicted in almost every respect by J. C. Hitt, an electrical engineer with extensive experience in the design and construction of high-tension transmission lines, who was called by the defendant. According to him, the design and installation of transmission towers and lines at the crossing in question were in conformity with the best practices in use at the time; the installation met or exceeded the safety requirements of the national electrical safety code, one universally recognized and accepted in the electrical industry; it would be impractical to install the wires higher or to cross the highway at any other loca-

tion; it would be far less satisfactory and far less safe to have them suspended under the bridge or placed underground. At the conclusion of Hitt's testimony, it was stipulated by counsel, in the interests of saving time, that Harry F. Brown, also called by defendant as an expert, would corroborate Hitt's testimony and expressed opinions in every respect and also that his qualifications as an expert in the field of electrical transmission were unquestioned. In this connection, also, is to be considered defendant's exhibit 13, the national electrical safety code, highly regarded as a standard of practice and procedure by all of the experts, including one called by plaintiffs.

Although from all of the evidence the court cannot find negligence on the part of the railroad with respect to the design, installation or location of the wire, there still remains for consideration the question whether, under the circumstances existing at the time, the railroad should have taken further additional precautions for the protection of those who it should reasonably anticipate might come into contact with the wire, located where it was. It is unquestionably true, as was so ardently stressed by plaintiffs' counsel throughout the trial and in their brief, that the highway at the time and place in question was not completed and that a different standard of care was involved than in the case of a completed highway with no work crews in the vicinity of the wire crossing.

The conclusion of the court with respect to the design, installation and location of the wire is unchanged, even taking into account the circumstances existing at the time, and the only remaining evidence of negligence on the part of the railroad boils down to that of its failure to de-energize the wires across Burr Road Bridge at the time of the

accident. As previously pointed out, it was the contractual duty of Cayuga to request the railroad to de-energize its wires when specific circumstances so required. The contract clearly established the procedure to be followed at any time that the employees of Cayuga, in the course of their work, were likely to be in danger of contact with high-tension wires maintained by the railroad. This procedure, according to the evidence, had been habitually and regularly followed throughout the construction of the Burr Street Bridge and adjacent sections of the highway.

The "groundman" for the railroad at Burr Road Bridge on the day of the accident testified that when he reported for work on the morning of the accident at about 7 o'clock, he had first checked with the Cayuga supervisor as to where the men would be working; that he had been advised they would be working under the bridge and not above; that early that morning, about 7:30, he had, at the request of a Cayuga employee, ordered and obtained de-energization of all four wires under the bridge, where men were painting; that he received no request to de-energize the wires over the bridge; that he was himself working under the bridge and did not know there was a crane on or near the bridge until after the accident happened. At this time, the basic structure of the bridge had been completed and workmen were engaged primarily in working below the bridge, painting, or on the surface or ramps, more than fifty feet below the overhead wires.

A Cayuga operator of a crane with an even longer boom than the one involved here testified that he had carried machinery with his crane across the same bridge a number of times during the weeks preceding the accident without contacting the over-

head wires. Actually, there was no more reason for the railroad to anticipate that a crane with an elevated boom would hit that wire on that date than that it would be struck by a low-flying helicopter from the nearby Sikorsky plant or touched by a boy flying a kite attached to a metal wire instead of a string.

The Connecticut decision most nearly in point on this phase of the case is *Hassett* v. *Palmer,* 126 Conn. 468, an action against the trustees of the same railroad involving the electrocution of a state highway department engineer and the injury of his coworker when one end of a steel tape being used by them slipped off the parapet of a Merritt Parkway bridge over the tracks of the railroad and came into contact with the railroad's high-tension wires located under the bridge. The Supreme Court found error in the Superior Court judgments for the plaintiffs. In the *Hassett* case, construction work was still in progress on the Merritt Parkway and although there was no evidence there, as there is here, that at the time of the accident men had been working upon the bridge or the highway in its vicinity, the important words are that it could not be assumed "that those who had been employed upon the highway after the completion of the bridge had been doing anything which would be likely to subject them to danger from the feed wire." Id., 474. The court then proceeded (p. 475) to quote with approval the language of the New York court in *Adams* v. *Bullock,* 227 N.Y. 208, 210, involving similar facts: "No like accident had occurred before. No custom had been disregarded. We think that ordinary caution did not involve forethought of this extraordinary peril."

Plaintiffs, in their brief, refer to the lower court decision in the *Hassett* case, in which error was

found, and also to *Reboni* v. *Case Bros., Inc.*, 137 Conn. 501, 504, where a crane was operating in close proximity to high-tension lines which "[i]t would have been good practice to have shut off" while the work was being done. As stated by the court, "[a] request by the defendant if made to the Hartford Electric Light Company would probably have accomplished it." Here, a simple request by those who knew that the crane was going to be operating near the wire, employees of Cayuga, who was contractually obligated to make such requests, would have shut the current off. This is not a case of delegation of duty by the railroad to Cayuga employees, whose negligence in failing, at the right time, to request shutoffs of current might be imputed to the railroad. This is simply a situation where, under a contractual arrangement, a custom of long standing had been evolved whereby a normally unanticipated danger, which could be anticipated only by the contractor, Cayuga, was to be expressly called to the railroad's attention by Cayuga with a request for de-energization. The railroad's failure to have more than one groundman on the job at Burr Road Bridge on November 6, 1957, and the failure of that one groundman to be on top of the bridge at the time instead of underneath it, where other employees of Cayuga were working, was not negligence on the part of the railroad. Of the many decisions from other jurisdictions cited in defendant's brief on this point, the following are most nearly in point, and appear to support the court's conclusion: *American General Ins. Co.* v. *Southwestern Gas & Electric Co.*, 115 F.2d 706 (5th Cir. 1940); *Isbell* v. *Union Light, Heat & Power Co.*, 162 F. Sup. 471 (E.D. Ky. 1958); *Luketich* v. *Duquesne Light Co.*, 389 Pa. 87 (1957); *Houston Lighting & Power Co.* v. *Brooks,* 161 Tex. 32 (1960); *Wilson* v. *Texas Electric Service Co.*, 265

S.W.2d 624 (Tex. Civ. App. 1954); *Boone* v. *New Orleans Public Service, Inc.,* 109 So. 2d 800 (La. App. 1959).

Although it is not strictly necessary for the court to continue with a consideration of the two remaining issues, it must observe, briefly, that even if some negligence had been found on the part of the railroad, through its failure, for any reason at all, to de-energize the wire, such negligence would not have been, under the circumstances, a proximate cause of the accident, since the negligence of Cayuga employees other than those charged with the responsibility of requesting de-energizing clearly intervened and was the direct proximate cause— notably the conduct of those operating the crane. See, on this point, *Miner* v. *McNamara,* 81 Conn. 690; *Nehring* v. *Connecticut Co.,* 86 Conn. 109; see also, by reason of its similarity on the facts to the instant case, *Lopes* v. *Connecticut Light & Power Co.,* 145 Conn. 313.

In view of the foregoing conclusions, it is not necessary to consider the question of contributory negligence on the part of the plaintiffs.

The issues are found for the defendant to the extent hereinabove set forth, and judgment may enter in favor of the defendant in each case without costs.

Since the intervening complaints of Cayuga Foundation Corporation filed in these actions are based on its right to recover either all or part of any damages awarded to plaintiffs Diggs and Arrigone as reimbursement for sums of money it has paid or become obligated to pay to them under the Workmen's Compensation Act, the judgments for defendant in each case are dispositive of these claims also.